IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GILLETTE COMPANY, BRAUN GMBH, and GILLETTE COMMERCIAL OPERATIONS NORTH AMERICA,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>SKYVISION, INC., DANE ROBINSON, and WATER PIK TECHNOLOGIES, INC.,<br><br>　　　　Defendants. | Civil Action No. 04-CV-12391 NMG |

## DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY FOR CHANGE OF VENUE

Defendants Water Pik Technologies, Inc., Skyvision, Inc., and Dane Robinson ("Defendants"), by and through their undersigned counsel, move the Court to dismiss the instant case or, alternatively to change venue. As more fully discussed in the Memorandum in Support of Defendants' Motion to Dismiss or Alternatively for Change of Venue, filed contemporaneously herewith, the grounds for this Motion are as follows:

1.　　The Court should dismiss this case as to all Defendants pursuant to F.R.C.P. 12(b)(1) because, notwithstanding an expressed desire by all parties to avoid litigation and the fact that the parties were then engaged in non-confrontational negotiations regarding a licensing agreement for the Patents-in-Suit, Plaintiffs filed this lawsuit seeking a declaratory judgment of non-infringement. At the time of filing, no objectively reasonable apprehension of being sued by Defendants existed, and thus, there was no actual controversy. Accordingly, the Court lacks subject matter jurisdiction.

2. Even if a controversy exists, the Court should, in its discretion, dismiss this case because Plaintiffs improperly filed this action to gain bargaining leverage during ongoing negotiations and to usurp the proper forum from Defendants. The Plaintiffs misuse of the Declaratory Judgment Act warrants discretionary dismissal by the Court.

3. Pursuant to F.R.C.P. 12(b)(2), the Court should dismiss this case as to Defendants Robinson and Skyvision, Inc. because those parties lack constitutionally sufficient contacts with the forum. Accordingly, the exercise of personal jurisdiction over Robinson and Skyvision, Inc. would violate due process;

4. Finally, in the alternative, the Court should transfer this case pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Colorado where a virtually identical action is now pending. Transfer is appropriate because Plaintiffs' bad faith tactic of expressing a desire to avoid litigation while secretly drafting and filing the instant action to obtain a bargaining advantage and usurp the forum from the true plaintiffs negates the first-filed rule and necessitates transfer to Colorado. Furthermore, because the Court does not have personal jurisdiction over all of the parties to this case, it should transfer this matter to the Colorado court, which has the requisite personal jurisdiction and where complete relief can be granted.

5. Accordingly, Defendants respectfully request that the Court dismiss this action or, in the alternative, transfer the case to the United States District Court for the District of Colorado.

Respectfully submitted,

*/s/ Patrick M. Curran, Jr.*
Thomas J. Sartory (BBO # 442500)
Patrick M. Curran, Jr. (BBO # 659322)
Goulston & Storrs
A Professional Corporation
400 Atlantic Ave.
Boston, MA 02110
Tel.   617-482-1776
Fax.   617-574-4112

Tucker K. Trautman (*pro hac vice* admission pending)
Scott P. Sinor (*pro hac vice* admission pending)
Dorsey & Whitney, LLP
370 Seventeenth St., Suite 4700
Denver, CO 80202
Tel.   303-629-3400
Fax    303-629-3450

ATTORNEYS FOR DEFENDANTS SKYVISION INC., DANE ROBINSON, AND WATER PIK TECHNOLOGIES, INC.

Dated: January 14, 2005

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that I have conferred with opposing counsel and have attempted in good faith to resolve or narrow the issues presented by this motion.

*/s/ Patrick M. Curran, Jr.*
Patrick M. Curran, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served by hand upon the attorney of record for each other party on January 14, 2005.

*/s/ Patrick M. Curran, Jr.*
Patrick M. Curran, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GILLETTE COMPANY, BRAUN GMBH, and GILLETTE COMMERCIAL OPERATIONS NORTH AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>SKYVISION, INC., DANE ROBINSON, and WATERPIK TECHNOLOGIES, INC.,<br><br>Defendants. | Civil Action No. 04-CV-12391 NMG |

### DECLARATION IN SUPPORT OF MOTION TO DISMISS OR ALTERNATIVELY FOR CHANGE OF VENUE

I, Richard D. Tipton, declare under penalty of perjury under the laws of the United States that the following is true and correct:

1. I am an attorney duly licensed to practice law in the State of California, and I am in-house counsel for Water Pik Technologies, Inc. My title is Vice President, General Counsel and Secretary. I also manage patent issues for certain of Water Pik Technologies, Inc.'s subsidiaries, including Water Pik, Inc. ("Water Pik"). If called to testify as a witness, I could and would competently testify as to the facts set forth below, as I know each to be true, based on my personal knowledge or upon my review of the files and records related to this matter.

2. Water Pik is a corporation organized and existing pursuant to the laws of the state of Delaware with its principal place of business at 1730 East Prospect Road, Fort Collins, Colorado. Water Pik is a subsidiary corporation of the erroneously sued Water Pik Technologies, Inc.

3.   In 1999, Dane Robinson and Skyvision, Inc. licensed United States Patents Nos. 5,573,020, 5,787,908, and 5,855,216 (the "Patents-in-Suit") to Water Pik. The Patents-in-Suit generally cover interdental cleaning devices.

4.   In the spring of 2004, the Gillette Company, Braun GmbH and Gillette Commercial Operations North America ("Plaintiffs") introduced several mechanical dental flossing devices. Specifically, they introduced the Oral-B Hummingbird Power Flosser and Pick and the Oral-B ProfessionalCare 8000 series (the "Plaintiffs' Products").

5.   After obtaining samples of the Plaintiffs' Products, Water Pik's engineers began analyzing them to determine whether they infringed the Patents-in-Suit. Specifically, Hal Leuttgen and Ken Hair analyzed the products. Mr. Leuttgen is an engineer who resides in Fort Collins, Colorado and works in Water Pik's facility there. Mr. Leuttgen is responsible for developing products derived from the Patents-in-Suit as well as analyzing products that potentially infringe the Patents-in-Suit.

6.   Ken Hair is the Vice President of Engineering of Water Pik, and is an engineer. Mr. Hair also develops products derived from the Patents-in-Suit and is responsible for analyzing products that potentially infringe the Patents-in-Suit. Mr. Hair resides in Fort Collins, Colorado and works at Water Pik's facility there.

7.   After analyzing Plaintiffs' Products, with the help of Mr. Lee Osman, a partner at Dorsey & Whitney specializing in patent law, Mr. Leuttgen and Mr. Hair determined that one or more of Plaintiffs' Products infringed one or more of the Patents-in-Suit. Mr. Leuttgen and Mr. Hair will likely testify as experts on behalf of Water Pik in this case. Virtually all of Water Pik's

documents relating to the Patents-in-Suit, as well as all documents related to the analysis conducted by Mr. Leuttgen and Mr. Hair, are located in Fort Collins, Colorado.

8.  During the summer of 2004, Dr. Robinson contacted Plaintiffs to inquire about the possibility of negotiating a licensing agreement. After several telephone calls between Dr. Robinson and Plaintiffs' in-house counsel, Mr. David Howley, the Defendants decided that all communication would go through me as Water Pik's in-house counsel.

9.  My first telephone call with Mr. Howley occurred on October 1, 2004. As Mr. Howley had previously been involved in discussions with Dr. Robinson, he suggested a loose structure to the conversation which continued throughout the negotiations. He suggested we first discuss the potential infringement and defenses thereto, and second discuss possible licensing terms.

10. Beginning in this first conversation, and continuing from time to time until Plaintiffs filed this case, Mr. Howley stated that the Plaintiffs strongly preferred to resolve these matters without litigation. I advised Mr. Howley that that was Water Pik's preferred route as well and that Water Pik did not want the exchange of information to merely be a fishing expedition by Plaintiffs. From there, we started discussing both the infringement and licensing issues on a weekly basis.

11. During the time period from October 1 through November 12, the parties talked no less than 10 times. Mr. Osman joined me on several of these calls, and continued the dialogue with Mr. Howley without me on at least one call. During the telephone call of October 21, including Messrs. Howley, Osman and myself, as we discussed potential infringement and defenses, I reiterated that Water Pik wanted to be sure the Plaintiffs weren't on a fishing

3

expedition and simply engaging in free discovery before litigation but that they were truly interested in pursuing licensing. I explained that if Plaintiffs were not serious about exploring the licensing option, Water Pik was willing to consider other legal avenues. I do not recall expressly threatening patent litigation during this call or at any other time. Mr. Howley responded that Plaintiffs typically take between three and four months to thoroughly explore the patent issues before entering into a license agreement and that I shouldn't be concerned. In fact, he again reiterated how Plaintiffs were litigation averse and wanted to pursue a business solution to the issues presented.

12. The parties continued their licensing negotiations throughout October and early November. I would describe the mood of the negotiations during this time period as amicable and non-confrontational. Naturally the parties recognized that the subject matter was significant, but everyone appeared to be resolved to finding a business solution.

13. On November 2, the parties had a telephone conference during which Plaintiffs realized that Water Pik had licensed and was relying on not just the '020 patent, but the entire family of patents.

14. On or around November 4, Messrs. Howley, Osman and I held another telephone conference during which Plaintiffs asked for more time to analyze the family of patents. In response to Water Pik's concern that its business people thought we were close to a license agreement and were hoping to wrap this up soon, Mr. Howley stated in a voice mail left for me earlier in the day on November 4 that Water Pik shouldn't be worried because if the parties ultimately couldn't agree and the case went to litigation Water Pik's damages would go back six years, implying they had plenty of time to keep talking. During the telephone conversation on

November 4, I brought up Mr. Howley's voice mail and agreed that we should keep talking and the parties went on to discuss whether Plaintiffs would provide sales data to help Water Pik evaluate the amount of any royalty.

15. On November 10, Mr. Howley and Mr. Osman again discussed the possibility of Plaintiffs providing sales data regarding Plaintiffs' Products, as well as the Plaintiffs' latest theory of non-infringement. Based on an e-mail exchange between Messrs. Howley and Osman on November 10, I understood the November 10 call to be primarily focused on Plaintiffs' latest non-infringement theory, and not on business issues. Thus, I elected to let Messrs. Howley and Osman, both intellectual property specialists, continue the discussions that day. Mr. Osman relayed the matters discussed with me shortly after the call. After initially declining to provide any sales data, Plaintiffs offered to show their "good faith" in the negotiations by sending Neilson sales data to Water Pik on November 10 after the call between Messrs. Howley and Osman.

16. Less than 48 hours after this show of "good faith," and with no communication or indication of any change in the parties' negotiation stance, Plaintiffs filed the instant case.

17. When I learned that Plaintiffs had filed the complaint I contacted Mr. Howley on November 16 and asked him why he had taken such a "low blow" in the middle of negotiations. He stated that Plaintiffs felt they had come up with a good argument against infringement and decided to file. This confirmed my fear that Plaintiffs' strategy all along had been to fish for an argument that they felt strongly about and then file a suit to gain a bargaining advantage.

18. This was further confirmed during the next negotiations, which we were not able to hold until December 15 due to the lack of availability of Plaintiffs' outside counsel. During

the December 15 call, Plaintiffs suggested royalty rate dropped dramatically from the rates they had suggested during pre-litigation discussions.

Executed this 12th day of January, 2004

_____
Declarant

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served by hand upon the attorney of record for each other party on January 14, 2005.

                                                Patrick M. Curran, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE GILLETTE COMPANY, BRAUN
GMBH, and GILLETTE COMMERCIAL           Civil Action No. 04-CV-12391 NMG
OPERATIONS NORTH AMERICA,

    Plaintiffs,

v.

SKYVISION, INC., DANE ROBINSON, and
WATERPIK TECHNOLOGIES, INC.,

    Defendants.

## DECLARATION IN SUPPORT OF MOTION TO DISMISS OR ALTERNATIVELY FOR CHANGE OF VENUE

    I, Dane Robinson, declare under penalty of perjury under the laws of the United States that the following is true and correct:

    1.    I am a dentist as well as the President and only shareholder of Skyvision, Inc. If called to testify as a witness, I could and would competently testify as to the facts set forth below, as I know each to be true, based on my personal knowledge.

    2.    I am the owner of several patents, including United States Patents Nos. 5,573,020 (the "'020 patent"), issued on November 12, 1996, 5,787,908, issued on August 4, 1998, and 5,944,033, issued on August 31, 1999 (collectively the "Patents-in-Suit").

    3.    In or around 1997, I discovered that Braun GmbH was producing a product that infringed the '020 patent. Accordingly, I contacted Braun to discuss the possibility of licensing the '020 patent or some portion thereof to Braun.

4. Braun and I subsequently entered into negotiations which I would describe as amicable. Ultimately we entered into a limited license agreement regarding certain aspects of the '020 patent. Throughout the negotiations, Braun indicated its desire to avoid litigation relating to the patent, and the parties reached agreement without the need to file a lawsuit.

5. To my knowledge, Braun ceased manufacturing products practicing the '020 patent prior to 2000. In any event, I have not received any royalty payment related to the license agreement since before 2000.

6. The only time that I have ever visited Massachusetts was for a medical conference being held there in 2002 or 2003. I did not meet with Plaintiffs or attempt to sell or license the Patents-in-Suit, or any other items, while at this conference. Neither Skyvision nor I have ever produced any products nor have we advertised in Massachusetts. Between at least the year 2000 and 2004 I did not have occasion to contact anyone in Massachusetts, and did not speak with Plaintiffs about any licensing or patent issues. Neither Skyvision nor I own any property in Massachusetts. While it is possible that I sent correspondence to Massachusetts in the last five years, I don't recall doing so.

7. In 1999, I licensed the Patents-in-Suit to Water Pik, Inc. ("Water Pik"), of Fort Collins, Colorado.

8. In the spring of 2004, I discovered that Plaintiffs were producing products that potentially infringed the Patents-in-Suit. Upon purchasing and analyzing those products, I determined that one or more of the products likely infringed the Patents-in-Suit licensed to Water Pik. Accordingly, in or around July I contacted the Plaintiffs to

discuss the possibility of negotiating a licensing agreement between Plaintiffs, Water Pik and me. Given our history of negotiations from 1997, I anticipated that these negotiations would be friendly and productive and that we would resolve this matter without litigation.

9. During my discussions with Plaintiffs' counsel, Mr. David Howley, clearly indicated that Plaintiffs wanted to resolve this matter without going to court. This was consistent with my previous experiences with Braun. I indicated to Mr. Howley that neither I nor Water Pik were pursuing a cease and desist posture, but that I wanted to see if we could all work something out.

10. After several telephone calls with Mr. Howley, I turned the discussions over to Water Pik and Plaintiffs.

11. I was genuinely surprised when Plaintiffs filed suit in this case.

Executed this ___ day of January, 2005

_____
Declarant

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served by hand upon the attorney of record for each other party on January 14, 2005.

Patrick M. Curran, Jr.