UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE GILLETTE COMPANY, BRAUN GMBH,
and GILLETTE COMMERCIAL OPERATIONS
NORTH AMERICA,

                Plaintiffs,

   v.

SKYVISION INC., DANE ROBINSON and
WATER PIK TECHNOLOGIES, INC.,

                Defendants.

CIVIL ACTION NO. 04 12391 NMG

**DECLARATION OF DAVID HOWLEY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER VENUE**

I, David Howley, declare under penalty of perjury under the laws of the United States that the following is true and correct:

1. I am an attorney duly licensed to practice law in the Commonwealth of Massachusetts. I am in-house patent counsel for The Gillette Company. If called to testify as a witness, I could and would competently testify to the facts set forth below, as I know each to be true based on my personal knowledge or upon my review of the files and records related to this matter.

2. In 1996, defendant Dane Robinson ("Robinson") alleged that a product offered by Braun, Inc. and Braun Aktiengesellschaft (collectively "Braun") (subsidiaries of Gillette) infringed U.S. Patent No. 5,573,020 (the "'020 patent").

3. Negotiations between the parties ensued. Robinson and Chester Cekala, another in-house attorney at Gillette, communicated numerous times. Cekala worked from Gillette's headquarters in Boston

4. After negotiations failed to resolve the dispute, Braun feared Robinson would file an infringement action. Braun filed a declaratory judgment action in the U.S. District Court for

the District of Massachusetts seeking a declaration of invalidity and noninfringement of the '020 patent (Civ. No. 96-12454-PBS).

5. The parties settled the action on July 10, 1997. Attached as Exhibit A is a true and correct copy of the 1997 license and settlement agreement between Braun, Robinson, and SkyVision ("1997 Agreement").

6. The 1997 Agreement, signed by Robinson, SkyVision and Braun, granted Braun and its affiliates a license to the '020 patent. Braun paid Robinson an advance on royalties, so that future royalties would be deducted from this amount.

7. According to the agreement, any disputes concerning the settlement would be governed by Massachusetts law. See Ex. A at ¶ 6.07.

8. Seven years later, in July, 2004, Robinson again contacted Gillette regarding the '020 patent.

9. I responded to the call. I was surprised to learn that Robinson was accusing Gillette of infringing the '020 patent because we had a license to the patent.

10. Robinson told me that he had licensed the '020 patent to Water Pik – a competitor of Gillette. Robinson claimed that Water Pik's license covered a portion of the '020 patent that was not included in the 1997 Agreement. He alleged that Gillette's Oral-B Hummingbird power flosser infringed this portion of the '020 patent and violated the Water Pik license.

11. Gillette took these new infringement allegations very seriously. After comparing the accused product to the asserted patent claims, we determined that the Hummingbird product did not infringe the '020 patent.

12. I told Robinson that the Gillette did not infringe the '020 patent. From Boston, I spoke with Robinson a number of times; we discussed Robinson's infringement threats during these conversations.

13. Robinson grew frustrated with the progress of our discussions and attempted to ratchet up the pressure on Gillette by stating, "Water Pik is very serious about this matter. They have set up a budget for this issue." Based on my experience as an in-house corporate attorney, I

understood this comment to mean that Water Pik was setting up a budget in preparation for litigation against Gillette.

14. When my discussions with Robinson reached an impasse, Robinson suggested that I speak with Water Pik's general counsel, Richard Tipton. I understood that Robinson was delegating his negotiating authority to Water Pik.

15. Gillette had no history of negotiating patent disputes with Water Pik. Water Pik's direct involvement in the negotiations confirmed what Robinson had said: Water Pik was serious and preparing to fight. It also signaled to me that Robinson and Water Pik were increasing the pressure to try to force a favorable settlement.

16. I first spoke with Tipton and on October 1, 2004. I again explained why Robinson and Water Pik's infringement allegations were without merit.

17. The next time we spoke, Tipton had his outside litigation counsel on the phone. Lee Osman, a patent attorney at Dorsey & Whitney, LLP, joined Tipton for all remaining discussions. To me, the introduction of outside litigation counsel indicated an escalation of tensions, and that Water Pik was already using its "budget" for litigation. Osman and Tipton repeatedly declared that Gillette's Hummingbird product infringed the '020 patent.

18. During the week of October 18, 2004, three months after negotiations had begun, Tipton and Osman alleged for the first time that another Gillette product (the 8000 series power toothbrush) also infringed the '020 patent. This separate infringement accusation represented a major setback in the negotiations. I viewed this action as another attempt to gain leverage over Gillette by broadening the list of accused products and creating more uncertainty.

19. I analyzed the new infringement allegations and determined that the newly-accused products did not infringe for essentially the same reasons as were applicable to the Hummingbird product.

20. Negotiations grew tense. Tipton became increasingly irritated with Gillette's non-infringement position.

21. Finally, when Tipton could not persuade me on the merits, he threatened to sue Gillette. Tipton said, "That's where the suit comes in."

22. I understood this comment to be a clear and unequivocal threat. The threat was particularly evident in light of the fact that Robinson said Water Pik had already set up a budget for this matter. I feared that a suit was imminent if Gillette did not agree to Water Pik's terms.

23. Within days of threatening to sue Gillette, Water Pik accused Gillette of infringing two additional Robinson patents, U.S. Patent Nos. 5,787,908 (the "'908 patent"), and 5,944,033 (the "'033 patent"). The addition of these new patents marked the beginning of the end of the negotiations. Rather than narrowing the issues, Water Pik had opened up two new fronts.

24. I was shocked at the new infringement allegations and was convinced that Water Pik had no intention of negotiating a resolution to this dispute in good faith.

25. I studied the new patents, which are related to the '020 patent. I discovered a statement in the prosecution history that strongly supported our contention that our products did not fall within the claim scope of any of the three asserted patents.

26. On November 10, I had a final conversation with Water Pik's outside litigation counsel. I explained that the addition of the two new patents had substantially weakened Water Pik's position because the file histories for these patents further supported Gillette's non-infringement argument. Nevertheless, Osman refused to change his position.

27. By now the gap between Gillette and Defendants had widened and there was no apparent way for the parties to reach an agreement. At the end of the phone call, neither Osman nor I made any attempt to schedule future discussions. In the past, we had had a custom of always scheduling a time for the next phone call.

28. At this point, I clearly saw that the negotiations had become fruitless. And I believed that Robinson, SkyVision and Water Pik were about to file suit.

29. On November 12, 2004, Gillette filed this declaratory judgment lawsuit.

30. Most of Gillette's U.S.-based documents and witnesses relevant to this action are located in Massachusetts.

31. Based on Gillette's license agreement with Robinson and SkyVision, I believe that Robinson resides in Arizona and SkyVision has its principal place of business in Arizona.

Dated: February 28, 2005                    /s/ David Howley
                                            David Howley